Whitaker, Judge,
dissenting:
I agree with Judge Laramore that there is substantial evidence to support the findings of the Secretary of the Army, whether the Secretary acted on the recommendation of the Disability Review Board or of the Correction Board. In all of these cases the question for our determination is whether or not the action of the Secretary is arbitrary or capricious, or not supported by substantial evidence. In cases such as the one at bar he ordinarily acts through the Correction Board, but the law does not require him to withhold action until the Correction Board acts, nor to adopt the findings of the Correction Board. In this case he chose to follow the advice of the Disability Review Board without awaiting formal action by the Correction Board. I think this was within his province.
Since I agree with Judge Laramore that there is substantial evidence to support the findings of the Disability Review Board and the action of the Secretary, I think we have no jurisdiction to entertain plaintiff’s petition, because the law vests in the President, acting through the Secretary, authority to determine whether or not an officer shall be retired for physical disability, and I camiot say that he acted arbitrarily or contrary to the evidence. Only if the Secretary’s action was arbitrary or capricious can we set aside his action and render that judgment he should have rendered.
But, the court having found that we have jurisdiction and being of the opinion that plaintiff is entitled to retirement for physical disability, I think he is entitled to recover from the date of the action of the original Retiring Board, because plaintiff’s application to the Correction *779 Board was to correct bis record so as to show that he was physically disabled at the time of his retirement. Had the Retiring Board found that he was disabled at the time of his retirement, as the court now holds it should have found, he would have been entitled to recover his pay from that date, and I think we should award him judgment from that date.
KTNDINGS OK FACT
The court having considered the evidence, the report of Trial Commissioner Currell Yance, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff was appointed a first lieutenant, Dental Corps, Maryland National Guard, on June 22, 1917. He was mustered into Federal service July 25, 1917. He was appointed a captain, Dental Corps, United States Army, on November 25, 1918, and was honorably discharged on July 26,1919.
2. Plaintiff served in the United States Public Health Service from March 22, 1920, to January 3, 1924.
3. On March 26, 1923, plaintiff was federally recognized as a major, Dental Corps, Maryland National Guard. He was appointed a major, Dental Corps, Officers’ Reserve Corps, on September 21, 1923, and served as such until he was appointed a major, Dental Corps, National Guard of the United States, on May 17,1934. He was appointed a major, Dental Corps, Army of the United States, on February 3, 1941. He was promoted to lieutenant colonel, Dental Corps, Army of the United States, on June 17, 1941. He was honorably discharged from his commission as major, Dental Corps, National Guard of the United States, and lieutenant colonel, Dental Corps, Army of the United States, on August 29, 1945, by reason of physical disqualification.
4. Plaintiff was placed on the Army of the United States retired list in the grade of lieutenant colonel , on June 30, 1952, with entitlement to retirement pay from July 1, 1952, under the provision of sections 301 and 302 of the act of Congress approved June 2'9, 1948 (Public Law 810, 80th Congress). He is now a lieutenant colonel, Army of the United States, retired.
*780 5. Plaintiff served upon active duty as a commissioned officer from July 25,1917, to July 26,1919, and from February 3, 1941, to August 24, 1945. On August 29, 1945, lie was discharged by reason of physical disqualification.
6. The official records of the Adjutant General of the State of Maryland show that plaintiff served on active duty or on active duty for training in the Maryland National Guard as follows: from July 28, 1923, to August 11, 1923; from June 9,1924, to June 12, 1924; from July 12, 1924, to July 26, 1924; from July 26, 1925, to August 9, 1925; from July 24, 1926, to August 7, 1926; from July 24, 1927, to August 7, 1927; from July 28, 1928, to August 11, 1928; from July 27,1929, to August 10,1929; from July 26,1930, to August 9, 1930; from July 25, 1931, to August 8, 1931; from July 23, 1932, to August 6, 1932; from July 29, 1933, to August 12, 1933; from August 11,1934, to August 25,1934; from August 8,1936, to August 22, 1936; from August 7,1937, to August 21, 1937; from August 6, 1938, to August 20, 1938; from August 5,1939, to August 19,1939; and from August 5,1940, to August 25,1940.
7. On April 20, 1918, plaintiff was admitted to the Base Hospital at Gamp McClellan, Alabama, for influenza. He returned to duty on April 27, 1918. His next confinement in a hospital was on December 24, 1918, when he was admitted to Base Hospital No. 63 in France, with a diagnosis of appendicitis, acute, catarrhal. He returned to active duty on December 30,1918.
8. On February 23, 1919, plaintiff was admitted to Base Hospital 63, Expeditionary Forces, France. The following medical note was entered on his Field Medical Card by one of the doctors at that hospital: “There is undoubtedly some abdominal condition — chronic due to a congenital malformation. For many months has shown a marked mental instability that has on several occasions recently mainifested itself by a very frank hysteria. This has been noted by several medical officers.” His condition at that time was diagnosed as “hysteria, cause unknown, EPTE” (existed prior to enlistment). “In Line of Duty? No.” Plaintiff was released from Base Hospital 63 and returned to duty on February 26,1919.
*781 9. On March 9,1919, plaintiff was admitted to Base Hospital No. 54, France, and his condition was diagnosed as (1) colitis chronic; (2) constipation, spastic; (8) appendicitis, chronic. On March 20,1919, he was transferred from the above hospital to Base Hospital No. 208, France, where the diagnosis was identical to that made at Base Hospital No. 54 and in addition, he was recommended for transfer to the United States. Upon reaching the United States, he was admitted to U.S.A. General Hospital No. 2, Fort McHenry, Maryland, on May 5, 1919. He was placed on sick leave on May 26, 1919, with a final diagnosis of constipation, chronic, spastic, LOD yes. He returned to the hospital from this leave on June 14,1919, apparently symptom-free for he was discharged from the hospital and separated from the service by order, without disability, on July 28, 1919.
10. In 1921, plaintiff consulted Dr. Andrew C. Gillis, a specialist in neurology and psychiatry, concerning a nervous difficulty which Dr. Gillis diagnosed as a mild anxiety state (psychasthenia). He continued to see Dr. Gillis from time to time between 1926 and 1935 for a condition diagnosed by Dr. Gillis as severe psychoneurosis of the psychasthenia type. Dr. Gillis felt that by 1932 plaintiff’s mental condition was so severe as to be totally disabling.
11. On December 11, 1924, the Veterans Administration caused plaintiff to undergo a neuropsychiatric examination and the report of that examination reads in part:

Psychiatrical Examination:

He appears well groomed. He is very loquacious, especially when discussing his nervous difficulties. Emotionally he is very unstable and becomes lachrymose during the examination, especially when speaking of his inability to carry on the practice of dentistry. Concentration is not what it should be. No delusions or hallucinations. He is well oriented as to time, person and place. No homicidal or suicidal tendencies. Memory, at this time, for past and recent events is good, but patient states that there are times when his memory is rather poor, particularly about where he puts things, especially instruments about the office.

*782
Diagnosis:

Psychoneurosis hysteria, which constitutes a minor degree of disability.

Remarks:

Symptoms which patient manifests undoubtedly inconvenience him a great deal in his practice as a dentist; these are of a functional character and there are no symptoms from an objective neurological standpoint indicative of any central nervous lesion.
12. On December 31, 1924, plaintiff underwent further examination by the Veterans Administration. Under the heading “Brief outline of claimant’s disability since service,” the report prepared at that time reads in part:
* * * Since discharge: Has been engaged in his professional work continuously, either in the employ of U.S.P.H. and Vet. Bureau, or privately. For past year has not been carrying on well due to nervousness, inability to concentrate and insomnia. This condition has grown progressively worse, notwithstanding the fact that no apparent reason for worry could be ascribed, a profound state of mental anguish and instability has developed. _ Interfering greatly with successful application to his work. * * *
Plaintiff’s condition at that time was diagnosed as psy-chasthenia (emotional instability and depression), prognosis, guarded.
13. On January 21, 1925, the Veterans Administration rated plaintiff as temporarily, partially disabled to the extent of 15 percent and awarded him compensation in the amount of $12 per month beginning December 31, 1924. These payments were discontinued as of April 30, 1925, for the reason that plaintiff failed to report for reexamination.
14. Plaintiff was employed by the Maryland Casualty Company from 1925 to 1934. He organized and was in charge of the dental department and his work was described as eminently satisfactory and of the highest standard. Plaintiff himself was described as cooperative, loyal, popular with everyone.
15. In 1932, while still working for the Maryland Casualty Company, plaintiff sustained a severe injury to his right shoulder, and in 1933 he underwent surgery for the *783 injury. During his convalescence, his nervousness increased to the point where, at the urging of his family and friends, he entered the Phipps Psychiatric Clinic of the Johns Hopkins Hospital in Baltimore, Maryland, in January 1934. Dr. Gillis visited plaintiff and examined him at the clinic in February 1934, and found that he was suffering from an acute attack of his previous nervous condition, i.e., acute psychoneurosis. Dr. Gillis felt that an institution such as the Phipps Clinic was not the proper place for plaintiff and on Dr. Gillis’ advice plaintiff left the clinic on March 1, 1934, and went to Atlantic City where his condition improved.
16. Dr. Thomas A. C. Eennie attended plaintiff at the Phipps Clinic. Dr. Rennie described plaintiff’s condition upon entry as “loss of weight, depression, poor sleep and concentration, crying spells, constipation and a desire to give up his profession.” On March 8, following plaintiff’s departure from the clinic, Dr. Rennie diagnosed plaintiff’s condition as “recurrent depression with great agitation and panic episodes”.
17. On February 26, 1935, plaintiff submitted form P-1 to the Veterans Administration and on December 11, 1935, he was given a physical examination, at which time Dr. A. Warner, the neuropsychiatrist who examined him, diagnosed his condition as “psychoneurosis, psychasthenia, moderately severe, with residuals of emotional instability and anxiety trends. Partial social inadaptability.” He noted that plaintiff’s condition was gradually improving. On January 17, 1936, in connection with plaintiff’s claim, Dr. Rennie, who had been seeing plaintiff from time to time since March 1934, wrote to the Insurance Claims Council of the Veterans Administration and stated that plaintiff was suffering from “manic depressive psychosis, recurrent depression, with great agitation and panic episodes.” This represents the first mention in any of plaintiff’s medical records of a psychosis, and Dr. Rennie did not mention the symptoms on which he based this new diagnosis nor did he suggest any reason for changing his prior diagnosis of March 8, 1934. On the basis of all the medical records of plaintiff then before it, including Dr. Rennie’s changed *784 diagnosis, the Veterans Administration found plaintiff 39 percent disabled by reason of “Psychoneurosis, psychas-thenia, moderate with anxiety trends; partial social inadaptability.”
18. On July 19,1937, the Veterans Administration reduced plaintiff’s disability rating from 39 percent to less than 10 percent as the result of an examination of plaintiff by two neuropsychiatric specialists. On February 14, 1938, plaintiff went to work as a dentist for the Veterans Administration where he continued to work until called to active military service in 1941.
19. Plaintiff was commissioned in the Maryland National Guard on July 27, 1919, and underwent periodic physical examinations by the National Guard from May 1923 to July 1932 which were all essentially negative. The report of plaintiff’s National Guard physical examination dated August 31, 1933, contained a notation of neurasthenia since January 1933, improved. Plaintiff continued to receive periodic physical examinations until 1940 and they were all essentially negative except that with the exception of the report of December 21, 1939, each noted that plaintiff had suffered from “neurasthenia” in 1933 and 1934. The National Guard physical examination report for July 11, 1940, not only mentioned the “neurasthenia” but also referred to the history of plaintiff’s neurosis in the Veterans Bureau records and noted that the current examination showed him to be normal in that respect. Inasmuch as the medical history of plaintiff on file with the Veterans Bureau contained a full account of his hospitalization at the Phipps Clinic and also contained the two conflicting diagnoses made by Dr. Bennie, the National Guard was aware of plaintiff’s hospitalization at the Phipps Clinic. It does not appear from the record that plaintiff was aware of the new 1936 diagnosis of “manic depressive psychosis” made by Dr. Bennie, and in view of the fact that the Veterans Administration psychiatrists had pronounced him cured of his neuropsychiatric disability in 1937 and the fact that the National Guard had complete records on plaintiff, there was nothing misleading in plaintiff’s certification on his National Guard physical examination form that, to the best of his knowledge, he was *785 not suffering from any disease or disability which would interfere with the performance of his duties.
20. On January 6, 1941, plaintiff was given a final type physical examination and was found qualified for induction into active military service. Although the report of the examination did not mention plaintiff’s hospitalization at the Phipps Clinic in 1934 or Dr. Kennie’s manic-depressive psychosis diagnosis made in January 1936, one of the examining physicians for the Army had been one of the medical officers who had examined plaintiff and signed the July 11, 1940, National Guard medical examination report which report had noted plaintiff’s history of psychoneurosis contained in the Veterans Bureau records. In addition, Major Eleder had known plaintiff well for some 30 years and had worked with him in the Veterans Administration for 5 years. It is reasonable to conclude that the finding of the Army medical panel in 1941 that plaintiff’s nervous system was normal was not made in ignorance of his prior psychoneurotic illness nor of Dr. Kennie’s 1936 diagnosis, but rather that it was made on the basis of a determination that plaintiff’s nervous system was then normal as plaintiff’s medical records showéd it had been for the past 4 years.
21. Plaintiff entered on active duty for World War II service on February 3, 1941, as a major. On May 14, 1941, he was given a physical examination pursuant to his promotion to lieutenant colonel and was found physically qualified for the promotion. There is an entry of “normal” under “nervous system” on the report of this examination.
22. Following plaintiff’s induction in February 1941, and until late in 1944, he performed his military duties with distinction and was several times commended. In 1944 plaintiff was transferred to Camp Bowie, Texas, and placed in charge of a large dental clinic which was badly in need of reorganization and direction by an experienced and diplomatic officer. Plaintiff’s transfer for the assignment was specially requested by the chief medical officer and his work was highly commended.
23. Until the middle of 1943 plaintiff’s old gastro-intestinal difficulties gave him no trouble. On August 20, 1943, plaintiff was admitted to the Station Hospital, Camp *786 Barkeley, Texas, from which, he was released to active duty, condition improved, on August 80, 1943, with a final diagnosis of “cholecystitis, chronic, catarrhal. Cause undetermined. * * * Line of duty — No.” On September 14, 1943, he was again admitted to the Station Hospital, Camp Barkeley, Texas. He was released on September 19, 1943, condition improved, with a final diagnosis of: “(1) cholecystitis, chronic, catarrhal, cause undetermined; (2) prostatitis chronic [inflammation of the prostate gland] * * * ; (3) ureteral colic * * *.” On December 5, 1943, he was admitted to McCloskey General Hospital, Temple, Texas, and was released from this hospital on January 6,1944, with a final diagnosis of: “cholecystitis, chronic, moderate, type and cause undetermined. Existed prior to active duty.” After a 2-day confinement, he was discharged to duty from the Station Hospital, Camp Bowie, Texas, on February 10, 1944, with a final diagnosis of “pharyngitis [inflammation of the pharynx], acute, ca-tarrhal.” He returned to this hospital on October 5, 1944, and was discharged to duty with a final diagnosis of “cholecystitis [inflammation of the gall bladder], chronic, cause undetermined. * * * Line of duty — Yes; Condition * * * improved.” He was admitted to the Bronx Area Station Hospital on December 13, 1944, and was released the next day, condition improved, with a final diagnosis of chronic cholecystitis. On December 28, 1944, he was admitted to the Station Hospital, Camp Bowie, Texas, and was discharged to duty on January 9,1945, with a final diagnosis of: “No disease. Ill-defined condition of the gastrointestinal system, manifested by acute abdominal pain.”
24. On January 11,1945, plaintiff entered the Station Hospital, Camp Bowie, Texas, complaining of “vague pains which start over the right lumbar area and radiate up to the lower angle of the scapula on that side.” He was transferred to the Regional Hospital, Camp Barkeley, Texas, for further observation and treatment on January 14, 1945. The diagnosis at the time of transfer was the same as the diagnosis on January 9,1945.
25. Plaintiff was given a complete mental and physical examination while he was hospitalized in the Regional Hos *787 pital at Camp Barkeley, Texas. When he was first examined at that hospital the impression was that:
In my opinion this officer is probably a high-level cyclothyme who has a tendency to overreact to all situations, including his own symptoms. I do not believe that this is a psychotic process.
The Neuropsychiatric Board made a similar observation when plaintiff was again presented to them on February 3, 1945. However, they specifically stated that this diagnosis was tentative and they would defer making a definite diagnosis until outside information pertaining to plaintiff’s previous mental condition could be secured from plaintiff’s wife and medical officers who knew plaintiff on previous admissions. When plaintiff appeared before the Neuropsychiatric Board at the Regional Hospital at Camp Barkeley, Texas, on January 31 and February 3, 1945, they had no knowledge of his confinement at Phipps Clinic in 1934, as they only learned of this incident on February 13, 1945.
26. Plaintiff appeared before the board on February 15, 1945, and the report of this consultation reads as follows:
Since the patient appeared before the N.P. Board [Neuropsychiatric Board], Feb. 3,1945, we have had an opportunity to observe him closely, and to come to a definite opinion.
His behavior has been characterized by a position of activity, reliability, and circumstantial talk; and generally depressed mood with tearfulness. He has been running all over the hospital and those officers who had known him previously say there is a definite change along the lines of this disturbance. On interview two days ago the officer stated that he had been a patient at the Phipps Clinic for a period of about two months, some time ago. He is rather vague as to his condition at the time, but indicates that he was also overactive at that time, and that he also had some paranoid attacks at the time.
The ward officer and Chief of Medical Service feel that there is. probably an existence of chronic chol-ecystitis. This, however, does not explain why all of his complaints are negative. . Spinal tap is negative in all respects. There is no evidence of any organic types of reaction interlaying this procedure.
Impression: Psychosis, manic-depressive, hypomanic state. LD: No, EPTS, as there is evidence of a previous *788 attack about 1935 for which he was hospitalized at the Phipps Clinic.
Recommendations: In view of the limited facilities for treatment of Psychotic officer patients at this hospital, he should be transferred to a aesignatedPsychiat-ric center (William Beaumont General Hospital) with the least possible delay. He will require one officer and two enlisted men as escorts. We have discussed this with the commanding officer and registrar, and arrangements are being made to transfer him tomorrow, if possible. In the meantime, the Bed Cross should be contacted and advised about the patient’s imminent transfer so that they can get in touch with the Bed Cross at William Beaumont General Hospital, regarding the proper forwarding address.
While the patient remains in this hospital he must be considered potentially dangerous to himself in view of his depression. Although it is not necessary to transfer him to 1-8, he should have an attendant with him, day and night. If, however, his present condition becomes difficult he should be transferred to 1-8.
Herman Shdionsky, Major,MO.
27. Plaintiff was transferred to William Beaumont General Hospital on February 16, 1945. There, his final diagnosis was psychosis, manic-depressive, hypomanic state. There was a line of duty determination as follows: “No, EPTS as there is evidence of previous attack about 1935 for which he was hospitalized at the Phipps Clinic.” The report of a psychiatric examination, on the date of plaintiff’s transfer, by Herman Shlionsky, Major, MC, reads:
Patient began interview, displaying depressive features more and more, and although statistically the case may still be called hypnotic condition, it would not surprise me to find him in full blown manic state in a short time. He reacted poorly to the recommendation for transfer and has no insight to his condition.
28. The chief of the Neuropsychiatric Section at William Beaumont General Hospital, Lt. Col. George T. McMahan, made the following entry on plaintiff’s hospital record on February 20,1945:
This officer was admitted to WBGH on 17 Feb. 1945. On admission he appeared hyperactive, had some flight of ideas. He tended to be quite circumstantial and had great difficulty in ever arriving at his goal idea. He *789 talked at great length, showed some distractibility and some depression. He showed some difficulty in thinking and admitted that he felt somewhat confused. His speech centered chiefly about the fact that he should not be confined. He tends to repeat over and over the same line of talk. During the last 24 hours, after prolonged interviews with him, he has appeared to be somewhat quieter and more cooperative and is apparently making a sincere effort to adjust himself to his surroundings.
Tentative Diagnosis’. Manic depressive psychosis, manic type. He will be observed and studied further before mal diagnosis is made.
Eobert A. Wise, Captain, M.C., concluded an entry on plaintiff’s hospital record with the following diagnosis:
Impression: Psychosis, manic depressive, manic phase, (hypomanic). LOD, Yes, because of 4 years of service before this occurred, although he had a history of a mental episode in 1933.
The entry following, also by Captain Wise, was an N.P. staff note dated February 28, 1945, which read in part:
In conference with the Chief of Service, who has also seen this patient repeatedly, it is felt that the above diagnosis' is the correct one.
In an entry made March 19,1945, Captain Wise states that the LOD determination in his diagnosis is erroneous. The entry reads:
Further discussion [with] chief of service on this case brought out the fact that this was the natural course of manic-depressive phychosis and so the LOD is No EPTS. Also he has been overactive at least since Aug. 1943.
29. Plaintiff was given a gastro-intestinal examination while hospitalized at William Beaumont General Hospital and the impression of Capt. C. H. Dixon, M.C., the examining ' physician, was:
1. Cholecystitis, chronic, cause undetermined.
2. Cholelithiasis should be ruled out.
His report continued:
* * * A diagnosis of cholecystitis or cholelithiasis actually would have no baring [sic] on this man’s re *790 tirement. Either being a remeniable [sic] condition removable by surgical procedure.
30. Plaintiff was transferred from William Beaumont General Hospital to Walter Reed General Hospital, Washington, D.C., accompanied by one officer and two enlisted men on March 23, 1945, where the final diagnosis was “psychosis, manic-depressive, manic phase, (hypomanic) (psychiatric disorder).” He remained at Walter Reed until June 5,1945, when he left the hospital on terminal leave and he reverted to inactive status on August 24, 1945. When plaintiff was admitted to Walter Reed the transfer note stated that he was complaining about a spinal tap at the previous hospital and that plaintiff was greatly concerned about a positive Kahn test which had been made in February 1945. The report stated that plaintiff did not wish to be on a closed ward, and because he was not considered dangerous to others or himself, he was placed on an open ward where he was polite, pleasant and cooperative. He was permitted to go out on pass to spend the night at home in Baltimore.
31. On March 29,1945, plaintiff appeared before a Neuro-psychiatric Board at Walter Reed and after examining his clinical record and interviewing him, their diagnosis was psychosis, manic-depressive, manic phase, hypomanic, existing prior to service. The board recommended writing to Phipps Clinic for an abstract of plaintiff’s former hospitalization and further recommended that plaintiff be retired to his own care.
32. Pursuant to Army Regulation 600-500, which pertains to the disposition of psychotic personnel, plaintiff appeared before a medical board at Walter Reed General Hospital on April 20,1945, where his condition was diagnosed as psychosis, manic-depressive, manic phase (hypomanic). That board found that this condition existed prior to plaintiff’s entry into service and was not incurred in line of duty and was due to causes not incident to military service. When plaintiff appeared before a Disposition Board at Walter Reed General Hospital on April 23, 1945, the diagnosis was identical to that of the medical board. The findings of the Disposition Board were that the date of origin of plaintiff’s *791 incapacity was 19B4, and he became unfit for duty January 14,1945. They further found that the cause of the incapacity was not incident to service as it had existed prior to plaintiff’s entry upon active duty and was not permanently aggravated by active duty. The Disposition Board found that plaintiff’s defect was permanently incapacitating for general service and the degree of disability for military service was total permanent, not fit for any military duty. The recommendation of the Disposition Board was that plaintiff appear before an Army Retiring Board. The diagnosis and findings of the Disposition Board were approved by the Commanding General, Army Medical Center, Washington, D.C., on April 24, 1945.
33. In preparation for his appearance before the Army Retiring Board, plaintiff was given a physical examination at Walter Reed General Hospital on May 7, 1945. The opinion of the medical examiners was that plaintiff was permanently incapacitated for active service because of psychosis, manic-depressive, manic phase (hypomanic). They felt that this incapacity had its onset prior to plaintiff’s entrance upon active duty and that such incapacity was permanent and was not an incident of the service.
34. Plaintiff appeared before the Army Retiring Board with counsel on June 1, 1945. At this hearing Capt. Leopold A. Potkonski, M.C., and Capt. Frank A. Cassino, M.C., having been designated as medical examiners and witnesses by the Commanding General, Walter Reed General Hospital, were sworn and testified before the board. After plaintiff’s statement was read to the board, the following statements were made:
A. Medical Witness (Captain Cassino). The usual course of the disease of a manic depressive psychosis after the illness has mainly spent itself is one of complete recovery — so that an individual who spends a number of months perhaps in a hospital for an illness of this kind, will sometimes, after leaving the hospital be so completely recovered as to be able to return to whatever he did before he ever became sick and do as good a job as he ever did prior to his having become ill. A certain number of years very frequently pass without the _indi-vidual giving any indication to those about him or in his work of the previous illness, so that he might very well *792 have gone ahead after this illness in 1934 — been completely recovered, done his dental work and his other work, and conld have been extremely efficient at it, get into the Army, been free of symptoms at the time of his entrance on active duty, and do a good job in the Army, and still fall subject to a recurrence of the illness that he had nine or ten years previously.
Q. (To the second med. witness.) Do you concur in the opinion of your colleague ?
A. Medical Witness (Captain Potkonski). Yes, sir.
Q. Counsel (Captain Williams). I’d like to ask the Medical Examiners why the diagnosis of phychosis, manic depressive, was not made in 1934 at the Johns Hopkins Hospital ?
A. Medical Witness (Captain Cassino). I am sure I cannot tell why they did not make that diagnosis. I did not examine the patient at that time, I did not know him at that time, various hospitals follow various types of classifications. Our observation on the basis of the report which that hospital sent to us gives us every indication that according to the classification that the Army uses, the illness that the subject presented at that time would fall in that category.
Apparently Captains Cassino and Potkonski were, at that time, unaware of the fact that Dr. Bennie of the Phipps Clinic had made a final diagnosis of psychosis, manic-depressive. The record does not indicate what “report” was sent to the Army by the Phipps Clinic beyond a brief statement contained in a letter dated April 5, 1945, from the Besident Psychiatrist of the Phipps Clinic to Major J. W. Mollaun, Med. Adm. C., Army Service Forces, stating that plaintiff had been a patient at the clinic from January 3, 1934, to March 1, 1934, and had been discharged improved. The letter stated that the diagnosis reached had been “recurrent depression with great agitation and panic episodes. Psychopathic personality.” It does not appear that the Betiring Board had before it plaintiff’s medical records at the Veterans Bureau or the Veterans Administration.
35. The Army Betiring Board, after closing for deliberation and considering plaintiff’s case, found that plaintiff was incapacitated for active service; that said incapacity was not the result of an incident of commissioned service; that the *793 cause of said incapacity was psychosis, manic-depressive, manic phase (hypomanic); that the cause of said incapacity was not an incident of service; that said incapacity had its onset prior to entrance upon active duty and that said incapacity was permanent. The board made no finding concerning service aggravation nor any findings of natural progress. One of the board members had asked the medical witness whether anything in plaintiff’s military service might have aggravated his condition and the witness said that he knew of nothing and “could not prove” that plaintiff’s service environment had aggravated his condition.
36. The findings of the Army Eetiring Board were concurred in by the Surgeon General and were approved by the Secretary of War.
37. Plaintiff by letter dated June 2, 1945, requested a rehearing of his case by the Eetiring Board. It was not granted. The next action taken by plaintiff was on February 5, 1952, on which date plaintiff filed an application for review by an Army Disability Eeview Board. A hearing was held before the Army Disability Eeview Board on May 2, 1952. This board affirmed the earlier decision and findings of the June 1945 Army Eetiring Board. It found, in addition, that the cause of plaintiff’s incapacity “has not been permanently aggravated by military service.” The board concluded that the symptoms complained of and the findings recorded during active service were “recurring episodes of a preexisting condition, are not beyond the natural progress thereof, and do not constitute permanent aggravation.” As to the cholecystitis, the board found this condition was not incapacitating at the time of plaintiff’s relief from active duty. The findings of the Army Disability Eeview Board were approved by the Secretary of the Army. On December 15, 1952, plaintiff requested a rehearing. This was denied. The record presented to the Disability Eeview Board in 1952 contained plaintiff’s medical records on file with the Veterans Administration, and Dr. Gillis, the psychiatrist who had treated plaintiff for many years and who had examined him at the Phipps Clinic, testified concerning his hospitalization at the clinic and stated that at no time had he considered plaintiff to be psychotic. The *794 Board heard no testimony on the matters of service aggravation or natural progres.
38. On March 4, 1954, plaintiff filed an application with the Army Board for Correction of Military Records in which he requested that his record be corrected to show that the incapacity for which he was relieved from active duty and discharged from the Army in 1945 was the result of an incident of service. ■ In support of this application he submitted the affidavit of the doctor who treated him immediately after his discharge from the Army, together with documents and records.
39. On April 21, 1954, the Acting Adjutant General invited plaintiff to report to Walter Reed Army Medical Center, Washington, D.C., for the purpose of undergoing a complete medical examination, appearance before a Medical Board, and, if warranted, appearance before a Physical Evaluation Board. Plaintiff was informed this medical evaluation was necessary to determine whether or not he was disabled as a result of his military service so as to be permanently incapacitated for active service upon relief therefrom on August 29, 1945.
40. Plaintiff reported to Walter Reed Army Medical Center and was examined by Lt. Col. David P. Lauer, a member of the staff of the Neuropsychiatric Department on June 10, 1954. His diagnosis of plaintiff’s condition was: “anxiety reaction, chronic, severe, manifested by general nervousness, tremulousness, insomnia, fear of social situations, fear of hospitalization, etc., and pain in the rectum and gallbladder regions.” Plaintiff’s case was presented to a Medical Board, whose president was the Chief of the Neuropsychiatric Department of Walter Reed General Hospital. The Medical Board met on August 19, 1954, and their diagnosis was as follows:
Anxiety reaction, chronic, severe, manifested by general nervousness, tremulousness, insomnia, fear of social situations, fear of hospitalization, and pain in the rectum and gallbladder regions. Stress: mild, routine military service. Predisposition marked, previous similar illness in 1934. Incapacitation: severe for military service, and for civilian occupational and social adjustment. LOD: Yes, by aggravation. Unchanged.
*795 The Clinical Abstract presented to the Medical Board by the examining psychiatrist contained the following statement:
Review of the records in this case and present studies indicate that this patient’s condition in 1919, 1934, 1944 and subsequent to this date, have been manifestations of one illness. This illness at present may best be described as one of severe anxiety neurosis. There is no evidence of cyclic depression or' manic attacks in this 62-year-old individual, but rather one of severe anxiety with some volubility and talkativeness, but without severe pressure of speech or flight of ideas. His neurosis has been marked by episodes of exacerbation under stress.
41. By Special Orders dated August 20, 1954, plaintiff was notified to appear before a Physical Evaluation Board. The board, which was composed of 3 officers, one of whom was a member of the Medical Corps, met and heard plaintiff’s case on August 24,1954. This board’s findings were as follows:
The Board finds that, at the time individual was relieved from active military duty in 1945, he was permanently unfit for further military duty by reason of psychoneurotic disorder (anxiety reaction, chronic) which had its origin while in the active military service from 1917 and 1919 and which was permanently aggravated by military service from 1941 to 1945.
The records before the Physical Evaluation Board were most comprehensive and included plaintiff’s complete medical history, military and civilian, going back to the beginning of his World War I service and extending up to the time of the board proceedings in 1954. The president of the board summarized the records orally and stated that in his opinion the entire case hinged on the accuracy of the diagnosis of a psychotic disorder reached in 1945. Colonel Lauer was the medical witness and he was questioned extensively on the basis for his diagnosis of plaintiff’s ailment as a psycho-neurotic disorder and he was asked to explain his disagreement with the diagnosis of manic-depressive psychosis, Colonel Lauer testified that nothing in plaintiff’s medical records nor in the results of his examination of plaintiff indicated that he had ever suffered from manic-depressive psychosis. On the matter of aggravation, Colonel Lauer *796 stated that plaintiff’s neurotic condition had always been brought on by painful physical illness or injury and by pressure of work.
42. The Surgeon General, in a memorandum to the Army Board for Correction of Military Becords, dated October 18, 1954, stated the following:
In view of the additional data at hand, it is believed that the evidence of record indicates that at the time this officer was separated from the service his disability was such as would have warranted his retirement for physical disability under the laws, rules, regulations, and policies then in effect.
43. Upon receipt of the Surgeon General’s memorandum, the Army Board for Correction of Military Becords, recommended that plaintiff’s case be directed to the Army Disability Beview Board for reconsideration. This recommendation was approved by the Assistant Secretary of the Army, although there was no authority in any statute or regulation for such a reference under the circumstances.
A hearing was held before the Army Disability Beview Board on March 15, 1955. The findings of all the various boards which plaintiff had met in 1945,1952, and 1954 were introduced as evidence before the board, together with the medical records upon which they were based and the comments of the Surgeon General dated June 11, 1945, August 28,1946, and October 18,1954. Dr. Gillis was ill and his affidavit was introduced in evidence. Colonel Lauer testified at length, and both doctors stated that in their opinion plaintiff’s neurotic condition had been aggravated by his military service. Colonel Lauer explained that no psychological tests had been given to plaintiff in connection with the Medical Board proceedings in 1954 because both the colonel and the Chief of the Neuropsychiatric Department agreed that the tests would not be helpful in view of plaintiff’s great anxiety and fear of testing.
44. The findings of the Army Disability Board were as follows:
1. That Lieutenant Colonel John H. Frederick, DC-AUS, O 183 440, was permanently incapacitated for active service.
*797 2. That the cause of the incapacity was: Emotional instability reaction, with cyclothymic personality features which resemble at times: manic depressive reaction, recurrent depression, psychasthenia, hysteria and somatization reaction.
3. That the approximate date of origin of the incapacitating defect was: EPTS, 25 July 1917.
4. That the date officer became incapacitated for active service was: January, 1945.
5. That the cause of the incapacity was not an incident of service.
6. That the cause of the incapacity had not been permanently aggravated by military service.
7. That such incapacity for active service was not the result of an incident of service.
8. That the officer’s incapacity was not incurred in combat with an enemy of the United States and did not result from an explosion of an instrumentality of war in line of duty.

Conclusions:

The symptoms complained of and the psychiatric findings recorded while on active service are not beyond the natural progress of this preexisting defect and do not establish permanent aggravation.
45. The Disability Eeview Board did not send its findings and conclusions to the Correction Board but rather forwarded them to the Secretary of the Army who approved them on March 16, 1955. When plaintiff heard nothing from the Correction Board he requested a “review and hearing”. On February 9, 1956, the Acting Adjutant General wrote plaintiff that the Army Board for Correction of Military Eecords determined on January 25,1956, that plaintiff’s application for correction of his records had been denied because insufficient evidence had been presented to indicate probable material error or injustice.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c).
*798 In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on November 18, 1960, that judgment for plaintiff be entered for $26,620.72.